# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-4343

_____

Gerald Moses

*Plaintiff - Appellant*

v.

Dassault Falcon Jet - Wilmington Corp; Dassault Falcon Jet Corp

*Defendants - Appellees*

_____

No. 17-1056

_____

Gerald Moses

*Plaintiff - Appellant*

v.

Dassault Falcon Jet - Wilmington Corp; Dassault Falcon Jet Corp

*Defendants - Appellees*

_____

Appeals from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: December 14, 2017
Filed: July 3, 2018

_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.

_____

SMITH, Chief Judge.

Gerald Moses appeals from the district court's[1] grant of summary judgment to Dassault Falcon Jet–Wilmington Corp. and Dassault Falcon Jet Corp. (collectively, DFJ)[2] on his (1) age discrimination and retaliation claims brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA); (2) disability discrimination and retaliation claims brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA); and (3) state-law claim for age and disability discrimination and retaliation brought under the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101 *et seq.* (ACRA). We affirm.

## I. *Background*

"We recite the facts from the record in the light most favorable to [Moses], the nonmovant in this summary judgment disposition." *PPS, Inc. v. Faulkner Cty., Ark.*, 630 F.3d 1098, 1100 (8th Cir. 2011) (citation omitted). DFJ manufactures and sells jet aircraft. Moses began working at age 42 for DFJ as an Avionics Installer at its completion center in Little Rock, Arkansas, in 1997. In 2013, at age 58, Moses's job

_____

[1]The Honorable James M. Moody Jr., United States District Judge for the Eastern District of Arkansas.

[2]Before the district court, DFJ argued that all claims against DFJ–Wilmington should be dismissed because DFJ–Wilmington never employed Moses. Moses agreed. Moses does not challenge the district court's dismissal of the claims against DFJ–Wilmington on appeal.

title was Flight Line Avionics Checkout. Among other job duties, Moses accompanied the pilot on test flights of completed jet aircraft.

Prior to 2013, Moses received positive job performance evaluations. But he did experience occasional conflicts with his coworkers. Moses traces these incidents back to 2001, when supervisor Matthew Shrum stated "You'd better watch it. . . . You're making everybody look bad." Moses believed the comment stemmed from how he had outperformed others who were "leads" (supervisors). Defendants' Motion for Summary Judgment, Exhibit A, at 5, *Moses v. Dassault Falcon Jet–Wilmington Corp.*, No. 4:15-cv-00033-JM (E.D. Ark. Aug. 3, 2016), ECF No. 23-1.[3] Moses alleges that, from that point, his coworkers began harassing him "because they thought [he] was going to take their job." *Id.* On another occasion, Moses claimed that his tools were taken from him and placed on another aircraft. And, he asserted that he was falsely accused of being drunk at work and was sent home for four days awaiting the results of a urine test. After the test proved negative, Moses was allowed to return to work. Moses also claimed that Les Ashmore, a supervisor, told Moses that "if [Moses] was looking for trouble, that [Moses] found it." *Id.* at 9. Moses also complained to his superior, Ron Homsher, about Shrum. According to Moses, Shrum's mistreatment exacerbated his hypertension, causing his blood pressure to "shoot up over 200." *Id.* at 6. Some mornings, Shrum would immediately start yelling at Moses. Moses asked Homsher "not [to] put [him] on Shrum's team because [Moses had] been harassed by [Shrum] for a long time." *Id.* at 5. Homsher replied, "I'll put you anywhere I want to put you." *Id.*

Moses received his 2012 performance evaluation on January 4, 2013. Moses received an overall rating of "Needs Improvement." In the "Employee's Comments" section, Moses wrote: "I believe *my* stress on the job is . . . the reason for my poor evaluation. I hope my stress will be better in the near future." Defendants' Motion for

---

[3]Moses explained that "leads" is synonymous with "supervisors." *Id.*

Summary Judgment, Exhibit B, at 46, *Moses v. Dassault Falcon Jet–Wilmington Corp.*, No. 4:15-cv-00033-JM (E.D. Ark. Aug. 3, 2016), ECF No. 23-2; *see also* Defendants' Motion for Summary Judgment, Exhibit A, at 14. According to Moses, he also wrote that he was being harassed but "they tore it up." Defendants' Motion for Summary Judgment, Exhibit A, at 15. Specifically, Homsher told Moses that he "couldn't write harassment" on the performance evaluation. *Id.*

On August 12, 2013, Moses met with Gregg Gibbs, a Human Resources (HR) Generalist at DFJ to discuss Moses's performance. During that meeting, Moses told Gibbs that he was having trouble concentrating at work. On August 14, 2013, Moses met with Sharon Norwood with the HR Department. Moses had asked Norwood about the ramifications of early retirement. During their meeting, Norwood presented Moses with a written statement describing the available financial benefits for early retirement. Moses ultimately decided to keep working because his retirement pay would be significantly less than his current earnings.

Two days later, on August 16, 2013, Moses met with Eric Tate, Vice President of HR, and Gibbs. Tate and Gibbs asked Moses about a rumor that Moses had told coworkers that HR was trying to take away his job. Moses denied the accusation. Tate told Moses that DFJ was not trying to take his job away. Tate asked if Moses was still having problems concentrating, and Moses answered yes. Moses explained that his concentration problem stemmed from prescription medications he took. Moses had undergone two neck surgeries and took pain management medication daily. Moses was also on blood pressure medication. Tate suggested that Moses undergo an independent medical examination (IME) to assess Moses's ability to do his job and any potential work accommodations.

On August 27, 2013, Tate wrote Dr. Scott Carle of Concentra Urgent Care about conducting an IME of Moses. Tate explained that Moses "ha[d] received three consecutive overall ratings of Needs Improvement on his performance evaluations

dating back to January 2013" and had expressed several times he was "having difficulty concentrating." Defendants' Motion for Summary Judgment, Exhibit B, at 63. Tate noted that Moses had also "visited the Staff Nurse many times with concerns regarding his blood pressure." *Id.* Tate detailed the job duties required of Moses, including "operating, testing, modifying, troubleshooting, repairing[,] and inspecting of all avionics and electrical systems on the aircraft." *Id.* Because Moses's "duties impact[ed] the airworthiness of an aircraft," Tate stressed that "these potential mental and physical issues of Jerry's [were] much more critical." *Id.* Tate asked Dr. Carle to objectively collect information and opine on the following questions: (1) "Is Jerry able to adequately perform the physical and mental aspects relating to the core functions of his job today?"; (2) "If not, what if any accommodations are required to make him successful in his position?"; and (3) "If not, what type of position could be offered to him that he could be successful in the performance of its responsibilities?" *Id.*

On September 12, 2013, Dr. Carle conducted an IME of Moses[4] and concluded that Moses was not able to perform the essential functions of his job. In his written report, Dr. Carle responded to Tate's first question as follows:

> In review of Mr. Moses' job description the most prominent concerns are the "critical" job tasks which would necessitate a clear level of unimpaired executive functioning. Also, by way of physical demands, there appears to be a need to lift at a "minimum" of 45 pounds. Furthermore, working off ground level of 25 feet is a significant risk due to the medications he is taking regarding fall risk.

*Id.* at 75.

---

[4]Moses contends that the evaluation lasted "about three minutes." Defendants' Motion for Summary Judgment, Exhibit A, at 22.

In response to the second question concerning possible accommodations, Dr. Carle opined that "no known modifications of the essential functions" existed for Moses's position. *Id.* According to Dr. Carle, "The duration of these restrictions would be considered permanent." *Id.* As to Tate's third question concerning another type of position that DFJ could offer Moses, Dr. Carle explained that "[a]n alternative position would not include safety sensitive job functions that may place others at risk for harm and would include ground level work only without routine lift, push or pull of force exceeding 30 pounds occasionally." *Id.*[5] The record contains no medical testimony controverting Dr. Carle's opinion.

On October 17, 2013, Moses met with Norwood and Gibbs. They informed him that DFJ had explored the possibility of putting him in another position, but there were no openings at that time. They also informed Moses they were placing him on medical leave for three months. They advised Moses that should his medical condition change, he should contact HR.

On November 12, 2013, Moses filed a complaint with the Equal Employment Opportunity Commission (EEOC) against DFJ alleging that he was harassed because of his age in violation of the ADEA and harassed and suspended because of his disability and in retaliation for complaining in violation of the ADA.

On January 16, 2014, DFJ offered Moses a position in the Security Department. Moses declined the offer because it did not pay enough. The position also required him to carry a weapon, which he had never done before at DFJ. Moses also expressed that he "just couldn't go back" because "[e]verybody's going to make fun of me." Defendants' Motion for Summary Judgment, Exhibit A, at 25.

---

[5]As the district court noted, Moses does not challenge Dr. Carle's findings. Instead, Moses argues that the examination was not fair because it was short and that Dr. Carle failed to consider the effects to his health and job performance for what Moses perceives to be a long-term hostile work environment and harassment.

On February 18, 2014, Moses's attending physician, Dr. Richard Heck, signed a statement of functionality in conjunction with Moses's application for disability benefits. Dr. Heck stated that Moses's restrictions were "permanent" and that his "major depression and confusion continue to worsen." Defendants' Motion for Summary Judgment, Exhibit B, at 79. Dr. Heck further stated that Moses "[t]akes [a] significant amount of pain medications." *Id.* Finally, Dr. Heck concluded that Moses does have a psychiatric/cognitive impairment, being "major depression, confusion, possible bipolar disease." *Id.*

On May 30, 2014, the EEOC dismissed the complaint and gave Moses his right-to-sue letter. On June 18, 2014, DFJ sent Moses a letter terminating his employment, effective June 19, 2014. Moses was then 59 years old.

Moses filed suit against DFJ in Arkansas state court on August 28, 2014. The amended complaint alleged (1) age discrimination and retaliation claims brought under the ADEA; (2) disability discrimination and retaliation claims brought under the ADA; and (3) a state-law claim for age and disability discrimination and retaliation brought under the ACRA. DFJ removed the case to federal court and subsequently moved for summary judgment. The district court granted summary judgment to DFJ, holding that (1) Moses failed to exhaust his administrative remedies on his federal termination claims by not filing a new charge with the EEOC once DFJ terminated his employment; (2) Moses failed to present "sufficient evidence to show that the alleged harassment resulted from his membership in a protected class or that the alleged harassment was severe enough to affect the terms, conditions, or privileges of his employment"; (3) Moses did not rebut evidence offered by Dr. Carle's report that he was unable to adequately perform the essential functions of his job and that there were no known accommodations; and (4) based on the unrebutted medical evidence, Moses failed to prove that the reason for his termination was retaliation for requesting an accommodation. *Moses v. Dassault Falcon*

*Jet–Wilimgton Corp.*, No. 4:15-cv-00033-JM, 2016 WL 10611375, at \*4 (E.D. Ark. Oct. 31, 2016). Moses appeals.

## II. *Discussion*

On appeal, Moses argues that (1) his termination claims are part of a continuing violation inherent in his originally filed EEOC charge; (2) DFJ's actions created a hostile work environment; (3) DFJ did not attempt to make a reasonable accommodation; and (4) sufficient evidence of retaliation exists based on his job performance history.

"This court reviews de novo a grant of summary judgment." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted). We will affirm a district court's grant of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. *Termination Claims*
#### 1. *Failure To Exhaust Administrative Remedies*

Moses argues that the district court erred in dismissing his federal termination claims for failure to exhaust his administrative remedies. Moses does not dispute that he did not file a new charge with the EEOC when DFJ terminated his employment. Rather, Moses contends that his termination was part of a continuing violation that persisted since his initial EEOC charge. Moses asserts that the continuing violation doctrine applies to hostile work environment claims. Accordingly, he contends that he need only show that he filed his charge of unlawful termination within 180 days of any act that was part of the hostile work environment claim.

To assert an ADA or ADEA claim, Moses must have first exhausted his administrative remedies by filing a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C.

§ 2000e–5(e)(1) (180-day administrative filing period under Title VII); 42 U.S.C. § 12117(a) (§ 2000e–5 applies to ADA); 29 U.S.C. § 626(d)(1)(A) (ADEA's 180-day limitation period); *see also Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) ("Exhaustion of administrative remedies is a condition precedent to the filing of an action under the ADEA in federal court." (citation omitted)). "The reason for requiring the pursuit of administrative remedies first is to provide the EEOC with an initial opportunity to investigate allegations of employment discrimination and to work with the parties toward voluntary compliance and conciliation." *Parisi*, 400 F.3d at 585 (citation omitted).

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted). This means that "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citation omitted). Because "incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* at 118. As a result, to submit a timely charge, "the employee need only file a charge within 180 . . . days of any act that is part of the hostile work environment." *Id.*

By contrast, "[a] termination is a discrete act, not a continuing violation." *Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 826 (8th Cir. 2009) (citing *Morgan*, 536 U.S. at 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'")). The "termination occurs—and thus triggers the start of the limitations period—on the day it happens." *Id.* (citing *Morgan*, 536 U.S. at 110). The termination "day is when the employer notifies the employee of the

decision to terminate [his or] her employment." *Id.* (citations omitted). "Each discrete act is a different unlawful employment practice for which a separate charge is required." *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) (per curiam) (citing *Morgan*, 536 U.S. at 114); *see also Betz v. Chertoff*, 578 F.3d 929, 937–38 (8th Cir. 2009) (also applying *Morgan* in the ADEA context).

Here, Moses filed his EEOC charge on November 12, 2013, against DFJ. On May 30, 2014, the EEOC issued Moses a right-to-sue letter. DFJ terminated Moses effective June 19, 2014. Moses's termination played no part in the initial EEOC charge because the right-to-sue letter preceded the date of the termination. Contrary to Moses's argument, termination is a "discrete act" that constitutes an actionable adverse action; Moses never filed a new EEOC charge for the termination. Thus, all federal claims related to the termination are beyond the scope of the EEOC charge. The district court properly dismissed Moses's termination claims. *See Bass v. Univ. of Ark. at Pine Bluff*, No. 5:12-cv-00286-KGB, 2014 WL 4630459, at *13 (E.D. Ark. Sept. 16, 2014) ("Accordingly, because the Court concludes at this stage of the proceedings that Ms. Bass's hostile work environment claims under Title VII and the ADEA survive defendants' motion to dismiss, her entire hostile work environment claim is timely. This does not, however, salvage Ms. Bass's Title VII and ADEA claims based on her termination in April 2013, as termination is an easily identifiable discrete act to which the continuing violation doctrine does not apply and for which a separate charge is required." (citations omitted)), *aff'd* 694 F. App'x 458 (8th Cir. 2017) (per curiam); *Wilkes v. Nucor–Yamato Steel Co.*, No. 3:14-cv-00224-KGB, 2015 WL 5725771, at *10 (E.D. Ark. Sept. 29, 2015) (explaining that termination is a discrete act; therefore, the plaintiff's "arguments for the continuing violation theory [were] foreclosed by *Morgan*").

Accordingly, we affirm the district court's dismissal of Moses's federal termination claims for failure to exhaust his administrative remedies.

## 2. *ACRA*

Moses's failure to exhaust his administrative remedies on his *federal* termination claims does not affect his ACRA termination claim based upon actual disability.

"To establish a prima facie case of disability discrimination, a plaintiff must show (1) that he or she was disabled; (2) that he or she was qualified to do the essential job functions with or without reasonable accommodation; and (3) that he or she suffered an adverse action due to his or her disability." *Alexander v. E. Tank Servs., Inc.*, 505 S.W.3d 239, 245 (Ark. Ct. App. 2016) (citation omitted).[6] The Arkansas Supreme Court "has adopted the three-stage, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) in analyzing these types of employment-discrimination cases." *Id.* (citation omitted). Once the plaintiff establishes a prima facie case of discrimination, "a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee." *Id.* (citation omitted). After the employer provides this reason, "the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination." *Id.* (citation omitted).

Based on the record, we hold that no genuine issues of material fact exist on (1) whether Moses was qualified to do the essential job functions of Flight Line Avionics Checkout with or without reasonable accommodation; and (2) whether Moses was terminated due to his disability. Dr. Carle determined that Moses was unable to perform the essential functions of his job and that "no known modifications

---

[6]"ACRA claims are analyzed under the same principles as ADA claims." *Id.* (citation omitted). But "the statutes differ in that the ADA includes within its definition of the term 'disability' an individual who is 'regarded as' disabled by his or her employer, 42 U.S.C. § 12102, and ACRA does not include such language in its definition." *Id.* (citation omitted).

of the essential functions" existed for Moses's position. Defendants' Motion for Summary Judgment, Exhibit B, at 75. No other physician opined contrary to Dr. Carle's conclusions; in fact, Dr. Heck's subsequent opinion supports Dr. Carle's conclusion. Furthermore, Moses has presented no evidence that his disability was the reason for his termination.

Accordingly, we affirm the district court's grant of summary judgment on his ACRA actual-disability claim.

### B. *Hostile Work Environment Claim*

Moses contends that the district court erroneously granted summary judgment to DFJ on his hostile work environment claim because genuine issues of material fact remain as to whether DFJ created a discriminatory hostile work environment based on his age and disabilities.

> "To prevail on [his] hostile work environment claim," [Moses] must present evidence "'that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment.'" *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012) (quoting *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003)) (ADA hostile work environment); *see also Rickard v. Swedish Match N. Am., Inc.*, 773 F.3d 181, 184 (8th Cir. 2014) (ADEA hostile work environment). . . . To determine whether the harassment affected a "term[ ], condition[ ], or privilege[ ] of [Moses's] employment," "'we [must] consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [Moses's] job performance.'" *Ryan*, 679 F.3d at 778–79 (quoting *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010)).

*Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015) (first, third, fourth, fifth, and seventh alterations in original).

Moses points to the following evidence in support of his claim: (1) a supervisor told him he "better watch it" because he was "making everybody look bad," Defendants' Motion for Summary Judgment, Exhibit A, at 5; (2) Ashmore, another supervisor, told Moses that "if [Moses] was looking for trouble, that [Moses] found it," *id.* at 9; (3) Moses had his tools taken away and hidden from him; (4) Moses was falsely accused of being drunk at work and was sent home for four days awaiting the results of a urine test; and (5) when Moses asked Homsher to "not put [him] on Shrum's team because [Moses had] been harassed by [Shrum] for a long time," Homsher replied, "I'll put you anywhere I want to put you," *id.* at 5.

Moses has not linked any of these allegedly harassing actions to his age or disability. In fact, Moses testified that he thought the harassment began "because they thought [he] was going to take their job." *Id.* As a result, Moses has failed to show that the harassment resulted from his membership in a protected class. *See Sellers*, 791 F.3d at 945.

Alternatively, even if we assume that Moses linked the alleged harassment to his age or disability, "the conduct about which [Moses] complains is not severe enough to support his hostile work environment claim." *Id.* "The fourth element involves both objective and subjective components." *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009) (citation omitted). This element requires that "[t]he harassment . . . be 'severe or pervasive enough to create an objectively hostile or abusive work environment' and the victim must subjectively believe her working conditions have been altered." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

"The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment." *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). "The stringent hostile work environment standard is designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing.'" *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043. "[M]erely rude or unpleasant" conduct are insufficient "to affect the terms and conditions of employment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010) (quoting *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). The plaintiff must show "that the alleged harassment was so intimidating, offensive, or hostile that it 'poisoned the work environment.'" *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999) (quoting *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 214 (7th Cir. 1986)). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citation omitted).

Here, the complained-of conduct can be characterized "'rude or unpleasant,' but [it was] not 'severe enough to affect the terms, conditions, or privileges of [Moses's] employment.'" *Sellers*, 791 F.3d at 945 (quoting *Ryan*, 679 F.3d at 778–79).

C. *Failure-to-Accommodate Claim*

Moses maintains that the district court erred in granting summary judgment to DFJ on his failure-to-accommodate claim because the evidence shows that DFJ made no attempt to reasonably accommodate him. Moses asserts that he requested a job transfer that would have placed him under a different supervisor; according to Moses, this reasonable request would have enabled him to perform his job. He argues that DFJ took no action on his request.

-14-

Under the ADA, employers are prohibited from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Prohibited conduct includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id.* § 12112(b)(5)(A).

To prevail on his failure-to-accommodate claim under the ADA, Moses "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). "To establish a prima facie case of discrimination based on disability, [Moses] must show that he '(1) is disabled within the meaning of the ADA; (2) is a qualified individual under the ADA; and (3) has suffered an adverse employment decision because of the disability.'" *Id.* (quoting *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012)). "The term 'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1)(A). We apply a two-part test for determining "[w]hether an individual is qualified within the meaning of the ADA." *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015) (citation omitted). First, we ask whether the individual "possesses the requisite skills, education, certification or experience necessary for the job." *Id.* (quoting *EEOC v. Wal–Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007)). Second, we ask whether the individual "can, despite [his] impairments, perform the essential functions of the job either with or without reasonable accommodation." *Id.* (quoting *Wal–Mart Stores, Inc.*, 477 F.3d at 568). "Essential functions are 'the fundamental job duties of the employment position.'" *Id.* (quoting *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir. 1998)).

For purposes of our analysis, we will assume that Moses possesses the requisite skills, education, certification, and experience for the job. We next examine the second question—whether Moses can perform the essential functions of the job either with or without reasonable accommodation. We have already concluded that no genuine issues of material fact remain as to whether Moses was qualified to do the essential job functions of Flight Line Avionics Checkout with or without reasonable accommodation. Dr. Carle determined that Moses was unable to perform the essential functions of his job and that "no known modifications of the essential functions" existed for Moses's position. *See supra* Part II.A.2 (quoting Defendants' Motion for Summary Judgment, Exhibit B, at 75). As a result, Moses's failure-to-accommodate claim necessarily fails.

Accordingly, we hold that the district court did not err in granting summary judgment to DFJ on this claim.

D. *Retaliation Claim*

Moses argues his job performance history provides sufficient evidence of retaliation. According to Moses, the record shows that he received favorable job performance evaluations until he requested an accommodation after persisting in his complaints of harassment, bullying, and a hostile work environment. Moses contends that the treatment he received acerbated his disabilities.

The ADA prohibits retaliation, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). "A prima facie case of retaliation requires the plaintiff to show (1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection between the two." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016) (citation omitted). Under the ADA, a retaliation claim "requires a but-for causal connection

between the employee's assertion of her ADA rights and an adverse action by the employer." *Id.* (citation omitted).

Here, Moses cannot show but-for causation. *See id.* DFJ could legitimately terminate Moses if he was unable to perform the essential functions of his job. Undisputed medical evidence—Dr. Carle's IME—supports DFJ's determination that Moses could not do his job with or without accommodation. Therefore, Moses's ADA retaliation claim necessarily fails.

Accordingly, we hold that the district court did not err in granting summary judgment to DFJ on Moses's retaliation claim.

### III. *Conclusion*

We affirm the judgment of the district court.

_____